UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA,                     12-CR-968 (KMW)

    -against-

LEONARD WOLF,                                        <u>OPINION & ORDER</u>

        Defendant.

------------------------------------------------------x

WOOD, D.J.:

      After having pled guilty on July 23, 2014, Defendant Leonard Wolf ("Wolf" or

"Defendant") moved to withdraw his guilty plea, claiming ineffective assistance of counsel.

      Because all of the credible evidence in the record supports a finding that Defendant made

a knowing and voluntary decision to plead guilty, after having received the effective advice of

counsel, the Court denies the motion.

I.  <u>Background</u>

      A summary of the history of Defendant's legal representation in this case (including his

hiring, firing and re-hiring of lawyers) is contained in the Government's Memorandum of Law of

the United States of America in Opposition to the Defendant's Motion to Withdraw his Guilty

Plea ("Gov. Mem."), and will not be recited here.

      On July 21, 2014, immediately before jury selection, the Government stated on the record

the terms of the plea offers that had been extended to Defendant. As the Government's

Memorandum states:

> "First, the Government reported that, on or about September 18, 2013, the
> defendant was offered a plea agreement requiring a plea to Count One of the
> Indictment, which was the wire fraud of Botwinick, and calculating an offense
> level of 24, criminal history category of I and a Guidelines range of 51 to 63

months' imprisonment.  (Trial Transcript ('Trial Tr.') at 15-16; the *Lafledr/Frye* portion of the Trial Transcript is attached hereto as **Exhibit D**.)  The Government also reported that on the Thursday prior to trial the defendant was offered a plea agreement requiring a plea to both counts of the S2 Indictment and calculating an offense level of 31, criminal history category of I and a Guideline range of 108 to 135 months' imprisonment.  (*Id*. at 15).

   The Court then addressed the defendant with respect to the plea offers. The defendant confirmed that he had understood that these plea offers had been made to him and that he had rejected those plea offers.  (*Id*. at 15-16.)  Mr. Cohen [one of Wolf's retained trial counsel] then reiterated that he had discussed with the defendant the most recent plea offer involving a Guidelines calculation of 108-135 months and the defendant reiterated that he had rejected it.  (*Id.* at 16.)" (bracketed material added)

The Defendant proceeded to trial.  The evidence presented during the first two days of trial was devastating for Defendant.  Audio recordings played in Court featured many of Defendant's prodigious lies, designed to induce his victim to invest in his fraudulent scheme. The victim gave Defendant  $10,000,000.00 for investment, which the Defendant then spent on himself.  Defendant's lies included that he had degrees from the Massachusetts Institute of Technology ("M.I.T."), Harvard University and Yale University, that he was both an attorney and a medical doctor, that he was a senior official of Roche Pharmaceuticals, and that, in that capacity, he planned to appoint his victim to the corporate board of Genentech, a Roche Pharmaceutical ("Roche") subsidiary.

The Government countered Defendant's claim of an M.I.T. degree with testimony from Defendant's personal assistant that Defendant had gone to great lengths to fabricate a doctoral dissertation from M.I.T.  The Government disproved the lies regarding Roche and Genentech by calling an employee in Genentech's legal department who testified that Defendant was not an employee of either Roche Pharmaceuticals or Genentech, and had no responsibility for their

personnel decisions.

The testimony also included Defendant's lies about how his victim's $10 million was "invested," including that the money had been moved from Marseille, France, then to Korea and China, during the course of which he claimed the "investment" had grown first to $51 million, and then to $91 million.

The Government was able to expose as a lie Defendant's claim that he had invested the money jointly with John Discoll, a son of a founding family of Weyerhaeuser Corporation, by calling Discoll as a witness, who testified that he had never met Defendant or invested money with him.

Before trial resumed for a third day, Defendant informed the Court that he wished to plead guilty to both counts of the Indictment in which he was charged.  The ensuing proceedings are aptly summarized in the Government's Memorandum:

> "Before the defendant's guilty plea allocution, the Government, at the Court's request, read aloud the maximum penalties for Count One of the S2 Indictment ("30 years' imprisonment, five years of supervised release, a maximum fine of the greatest of twice the defendant' gain or twice the loss to people other than the defendant from the offense, and a $100 special assessment") and Court Two of the S2 Indictment ('20 years' imprisonment, a maximum term of three years' supervised release, a maximum fine of the greatest of $250,000 or twice the defendant's gain or twice the loss to others from the offense, and a $100 special assessment). (*Id.* at 342-43).
>
> Then the Court placed the defendant under oath, determined that he was competent to proceed, and conducted the inquiry required by Rule 11. (*Id.* at 346-365). The defendant confirmed, among other things, that he understood he was testifying under oath during the allocution. (*Id.* at 347). After the defendant confirmed that he had a clear mind (*id.* at 347) and was not under the influence of any alcohol, medication or drugs (*id.* at 348), and after defense counsel confirmed that the defendant was competent to plead (*id.* at 348-49), the Court found that the defendant was fully competent to enter an informed plea (*id.* at 349).

The Court then properly advised the defendant of the rights that he would be giving up by pleading guilty (*Id.* at 349-51). The defendant confirmed that he understood, among other things, that he would be waiving his right to continue in the ongoing trial where the Government would have to prove his guilt to the jury beyond a reasonable doubt, as well as the right to testify in his defense. (*Id.* at 351). The Court advised the defendant that he had the right to change his mind about pleading guilty but the defendant confirmed that he did not wish to change his mind. (*Id.* at 351-52).

The Court then advised the defendant of the maximum penalties applicable to the crimes to which he was pleading guilty. (*Id.* at 352-56). The defendant confirmed that he understood the penalties associated with both counts including a maximum sentence of 30 years' imprisonment on Count One (*id.* at 352-53), a maximum sentence of 20 years' imprisonment on Count Two (*id.* at 355-56), and that 'if [the Court] decided to run the sentences consecutively, [his] custodial sentence would be a maximum of 50 years' (*id.* at 356). The defendant then confirmed that he had discussed with his attorneys how the Sentencing Guidelines apply to his case (*id.* at 357) and that he understood that the Court had the authority to impose any sentence higher or lower than the advisory Guidelines range (*id.* at 358). The defendant then stated that he understood that no one, including his attorneys or anyone from the Government, could or should give him any assurance as to what his sentence would be (*id.* at 358) and that no one had told him what his sentence would be (*id.* at 359).

The Court then asked the defendant to state what he did in connection with the crimes to which he was pleading guilty. (*Id.* at 360). After initially asserting that he had simply borrowed the money from Botwinick, the defendant ultimately admitted that he had obtained the money from Botwinick by making false statements to him. (*Id.* at 361). With respect to Count One, which related to the conspiracy to defraud financial institutions, the defendant admitted that, along with Schumacher, he had submitted false applications for loans from banks. (*Id.* at 363-64). Finally, the defendant confirmed that he was pleading guilty because he was actually guilty, and was doing so voluntarily and of his own free will (*Id.* at 364-65). Following the allocution, the Court accepted the defendant's guilty plea, finding that the defendant knew his rights, was 'waiving them knowingly and voluntarily,' and that the guilty plea was supported 'by an independent basis in fact, containing each of the elements of the offense.' (*Id.*).

The Court next turned to the issue of bail. The Government moved for the defendant's remand. Defense counsel requested the defendant's continued release, relying in part on a statement from the defendant's pretrial services officer in Florida, who reported that the defendant had complied with the conditions of his release. (*Id.* at 368). In response, the Government informed the

Court that the defendant had violated his bail conditions by attempting to obstruct the Government's investigation in various ways, including by hiding Schumacher at a hotel in Florida and later in Tennessee to prevent the Government from finding him in case he decided to testify against the defendant (*id.* at 371-72), instructing Bresler to destroy relevant documents including the forged Massachusetts Institute of Technology doctoral dissertation (*id.* at 373), and having Schumacher sign false affidavits to substantiate the defendant's false defense to the charges (*id.* At 374). Citing the defendant's attempt to obstruct justice, his 'violent streak [that] came out at trial pungently,' (*id.* at 380), the defendant's use of false names and false documents and the lengthy sentence he was facing, the Court denied bail and remanded him (*id.* at 378-81)."

## II.  Motion to Withdraw Guilty Plea

On February 6, 2015, over six months after his guilty plea, Defendant moved *pro se* to withdraw his guilty plea, and stated that he had discharged his retained attorneys, including Cohen and  Buckley.

The Court appointed CJA counsel, Avrom Robin, to represent Defendant.  Thereafter, Defendant signed a waiver of attorney-client privilege with respect to all of his former attorneys (Buckley, Cohen, Marks, Sutton, Villamar and Levy).

The Declaration that Defendant submitted to support his motion to withdraw his guilty plea contained the assertions that follow, *inter alia*; I find Defendant's assertions incredible. Each of  Defendant's assertions is contradicted by the evidence cited after each assertion.  I find credible all of the evidence that contradicts Defendant's assertions

### A.  **Defendant's Assertion:**

Defendant was never advised, either before trial or before he pled guilty, of the potential Guideline range in the event of his conviction after trial.  He learned that range only when he read his Presentence Report after he pled guilty, and that he was never informed of the consequences of a trial conviction or of a guilty plea (Decl. ¶¶6, 7).

5

**Evidence Contradicting Defendant's Assertion:**

(i) <u>Defendant's Plea Allocution</u>:  On July 31, 2014, right before jury selection, Defendant confirmed that he knew the terms of the plea agreements he had been offered, and that he had rejected them.

(ii) <u>Affidavits of Cohen, Buckley and Sutton</u>:

They each discussed the Sentencing Guidelines with Defendant many times prior to his guilty plea (Cohen Aff. ¶¶6-7, Buckley Aff. ¶¶16, 19, Sutton Aff. ¶5).

(iii) <u>Trial Transcript</u>:  The prosecutor placed on the record on July 21, 2014, immediately before jury selection, the terms of the plea offers to Defendant.  The first was made on September 18, 2013 (which carried an Advisory Sentencing Guideline Range of 51-63 months), and the more recent offer carried an Advisory Sentencing Guideline Range of 108-135 months (Govt. Mem. 6-7).

On the day of  Defendant's guilty plea, and before allocution, the prosecution stated on the record the maximum penalties Defendant faced, and how the Sentencing Guidelines applied to his case, *inter alia*.

B. **Defendant's Assertion**:   claims he was nervous, confused and exhausted when he pled guilty.

**Evidence Contradicting Defendant's Assertion**:

<u>Defendant's Plea Allocution</u>:  Wolf stated, during his plea allocution, that he had a clear mind when pleading guilty  (Plea Tr. at 347).

C. **Defendant's Assertion:**  He was induced to plead guilty, involuntarily, after two days of trial, because two of his lawyers (Michael B. Cohen ["Cohen"] and Michael Buckley

["Buckley"] told him

> ..."I must change my plea to guilty because otherwise I 'would get
> 30 years from the Judge because after Madoff, she had imposed the
> maximum sentence on every fraud defendant convicted at trial.'  I
> was also told by Cohen and Buckley that if convicted at trial, 'she
> will throw the book at you, a reference to Judge Wood."  Cohen
> and Buckley...pressured me to change my plea to guilty, and told
> me "You better plead this thing out or she'll slap you in jail for 30
> years."  (Defendant's Declaration at ¶¶ 9 and 11, attached as Ex. A
> to Defendant's Mem. Of Law in Support of Motion to Withdraw
> Guilty Plea ("Decl.").

**Evidence Contradicting Defendant's Assertion**:

(i) <u>Defendant's Plea Allocution</u>: Defendant stated he was pleading guilty voluntarily, and
of his own free will, because he was actually guilty (Plea Tr. at 364-65).

(ii) <u>Affidavits of Buckley, Cohen and Sutton</u>:  none of them conveyed to Defendant that
he would certainly receive a 30-year custodial sentence if convicted at trial (Buckley Aff. ¶19;
Cohen Aff. ¶11; Sutton Aff. ¶8).  No one mentioned the Madoff case to Defendant (Cohen Aff.
¶11; Sutton Aff. ¶8).  Buckley and Cohen both "advised [Defendant] that he was probably lucky
to be in front of Judge Wood in that her reputation as to sentencing of white collar criminal
defendants was that she was fair and, if anything, lenient" (Buckley Aff. ¶19).

D.  **Defendant's Assertion:**  He was advised by counsel that he could "appeal his
guilty plea" and that such an appeal would "absolutely" result in the guilty plea being
"overturned" and that "it was no big deal and you will be going home tonight," and that this
would delay any final result by two years, during which time he would be out on bail (Decl. ¶¶
13-17).

**Evidence Contradicting Defendant's Assertion:**

(i) <u>Buckley Affidavit</u>:  Buckley states "There was no discussion of Wolf's guilty plea being overturned on appeal.  As for the defendant's continued release after pleading guilty, Mr. Cohen and I advised Mr. Wolf that it was likely that he would be remanded after changing his plea but that it would be up to the judge to decide" (Buckley Aff. ¶20).

(ii) <u>Cohen Affidavit</u>:  Cohen states: "Neither I nor any of Mr. Wolf's other attorneys ever said that his guilty plea would be overturned on appeal and that I was likely to win such an appeal because of my appeal experience.  At no point did we convey to Mr. Wolf that the purpose of pleading guilty was simply to buy time before winning the case on appeal.  I never told Mr. Wolf that a guilty plea would likely push a final resolution on his case back by two years" (Cohen Aff. ¶12).

(iii) <u>Affidavit of Sutton</u>:  there was no discussion of Defendant's guilty plea being overturned on appeal, or of the purpose of pleading guilty to "buy time."  He, Buckley and Cohen told Defendant that the government would object to his being released on bail, and that the decision was up to the judge (Sutton Aff. ¶¶ 7, 9).

E. **Defendant's Assertion:**  that he is innocent of the crimes charged.

**Evidence Contradicting Defendant's Assertion:**

(i) <u>Trial Testimony</u>:

In less than two days of trial testimony, the Government presented overwhelming, credible proof of Defendant's guilt on Count Two of the Indictment; and the prosecution stated it was ready to go forward to prove Count Two of the Indictment.  Defendant has cited no evidence to the contrary.

(ii) <u>Defendant's Plea Allocution</u>:   Defendant stated that he was pleading guilty because

8

he was in fact guilty.

F.  **Defendant's Assertion**:  that he urged Buckley to hire a psychologist for the purpose of withdrawing his guilty plea.

**Evidence Contradicting Defendant's Assertion**:

Affidavits of  Cohen and Buckley:  state that the purpose of hiring a psychologist was to prepare a report to assist with sentencing mitigation, not to provide support to withdraw his plea. Buckley hired Erica Weisman, a respected psychologist, with whom Defendant met once, and with whom he refused to meet thereafter (Buckley Aff. ¶¶23, 25; Cohen Aff. ¶16).

G.  **Defendant's Assertion**:  that he had urged his attorneys many times to hire a private investigator.

**Evidence Contradicting Defendant's Assertion**:

Affidavits of Cohen and Buckley:  Cohen states that Defendant never spoke to him about hiring an investigator, or about more thoroughly investigating the Government's witnesses (Cohen Aff. ¶14).  Buckley states that Defendant repeatedly told Buckley, pretrial, that Botwinick (the victim) had been involved in fraud; in response, Buckley asked Defendant to hire an investigator to look into that and potentially develop useful cross-examination of Botwinick. Defendant, however, never gave Buckley the authority or money to hire an investigator (Buckley Aff. ¶10).

H.  **Defendant's Assertion**:  Defendant was pressured to plead guilty because his lawyers, Cohen and Buckley, were not prepared for trial and had not properly investigated the case, notwithstanding Defendant's repeated urgings to hire an investigator and investigate the Government's witnesses (Decl. 18-21).

**Evidence Contradicting Defendant's Assertion:**

(i) <u>Cohen Affidavit</u>:   Cohen was fully prepared to go to trial, and never conveyed to Defendant that he could have used more time to prepare (Cohen Aff. ¶14).

(ii) <u>Buckley Affidavit</u>:   Buckley states "At no point did I, nor any of Mr. Wolf's attorneys in my presence, express to Mr. Wolf that we had been unprepared for trial or could have benefitted from more time to prepare" (Buckley Aff. ¶21).

I. **Defendant's Assertion**:  that Buckley's conflict of interest deprived Defendant of his Sixth Amendment right to counsel (Buckley had interviewed Schumacher and thus could not both act as Defendant's attorney and cross-examine Schumacher).

J. **Defendant's Assertion**:  "From the time of my guilty plea in July of 2014, to the date in March when Mr. Robin was assigned to represent me at my request to the Court, I have had no legal counsel from by [sic] prior attorneys, and thus I felt unrepresented during that time.  (Wolf Decl. ¶41).  I was never aware that the period of time from the entry of a guilty plea to the filing of a motion to withdraw that plea was a factor for the court to consider until present counsel explained it to me.  Had I known that I would have brought my motion to withdraw my guilty plea much earlier."  (Wolf Decl. ¶42)

**Evidence Contradicting Defendant's Assertion:**

(i)  Cohen Affidavit:

"15.  On or about July 24, 2014, shortly after Mr. Wolf's guilty plea, I visited Mr. Wolf at the Metropolitan Correctional Center, New York.  We discussed cooperation as a possible way to mitigate his sentence.  At no point during this discussion did Mr. Wolf indicate any second thoughts about his guilty plea or express any desire to withdraw his guilty plea.  At no point did Mr. Wolf complain that I or any of his other attorneys had coerced him into pleading guilty to something that he hadn't done.

10

16.   During a subsequent meeting with Mr. Wolf, Mr. Buckley and I discussed other ways that we could seek sentencing mitigation.  To that end, we arranged to have him examined by a psychologist of his choice, Dr. Weisman. The purpose of Mr. Wolf speaking with Dr. Weisman was to explore any psychological reasons why Mr. Wolf had committed the crimes to which he pleaded guilty.  I never coached Mr. Wolf on what to say to Dr. Weisman, nor did I tell Mr. Wolf to lie to Dr. Weisman.

17.   I did not receive any indication that Mr. Wolf was considering withdrawing his guilty plea until November 2014, when I learned from Dr. Weisman that Mr. Wolf was claiming that I and Mr. Buckley had forced him to enter a plea of guilty and that he had been tired and having trouble sleeping and hearing at the time he entered the plea.  Upon finding out that he was considering withdrawing his guilty plea, I asked Mr. Wolf if he wanted me to file a motion to withdraw his plea but Mr. Wolf never gave me a direct answer on what he wanted us to do.

18.   In or about February 2015, I learned that Mr. Wolf had terminated me when I received notice through ECF that Mr. Wolf had filed the Motion.  Until that point, I had been working on potential strategies for sentencing mitigation." (Cohen Aff. ¶¶15, 16, 17, 18)

(ii)   Buckley Affidavit:

"22.   In the months after his guilty plea, Mr. Wolf never expressed any intention whatsoever as to potentially withdrawing his plea.  It was our impression that Wolf was bona fide in his acceptance of responsibility, and we set about addressing sentencing issues.

23.   Mr. Cohen and I met with Mr. Wolf in early October 2014 [over two months after Defendant pled guilty] at the MCC in Manhattan to review Mr. Wolf's PSR and to see if he wished to pursue mitigation as a sentencing consideration and he informed us he did.  The defense hired Erica Weisman, a respected psychologist, at Mr. Wolf's insistence, to pursue psychological reasons for committing the subject crimes.  We advised Mr. Wolf that if there were to be some psychological reasons at least partially responsible for what Mr. Wolf did, it had to be proffered by expert testimony in order to be persuasive to the Court. Neither I nor Mr. Cohen ever advised Wolf to make any misrepresentations to Dr. Weisman.

24.   The defense's motions to adjourn the sentencing were based upon Mr. Wolf's, and his wife's, assurances that Mr. Wolf wanted to pursue sentence mitigation with the assistance of a psychologist (whom Wolf had personally selected) and their desire to make restitution to the victim, as Mr. Cohen and I had

strongly suggested they do.

25.  Ultimately, Dr. Weisman interviewed Mr. Wolf on one occasion only. On two subsequent occasions, although Mr. Wolf agreed in advance to see her, he refused to meet with her.  On the third occasion, after assuring Mr. Cohen he would meet with her so that Mr. Cohen would file a motion to adjourn the sentencing, Mr. Wolf refused to come down from his dorm and meet with her although she was waiting for him in the MCC lobby.

26.  Wolf never advised us of any desire to withdraw or undo his plea in any respect until months after his plea.  We advised him that we did not think a motion to withdraw his plea would ultimately be in his interest.  Nonetheless, Mr. Cohen and I did tell Mr. Wolf that if he was adamant as to making the motion to withdraw the plea, we would assist him to the extent that we could.  However, Mr. Wolf never asked for out assistance in connection with such a motion." [bracketed material added] (Buckley Aff. ¶¶22, 23, 24, 25, 26).

This conflict of interest was the subject of a July 17, 2014, *Curcio* hearing, at which

Defendant waived the conflict of interest and acknowledged that he wished to retain Buckley as

counsel notwithstanding that Buckley would not be permitted to examine either Schumacher or

Breslin.  Defendant also agreed to waive any post-conviction argument, on appeal or otherwise,

based on Buckley's potential conflicts.  (Transcript of *Curcio* Hearing on July 17, 2011, attached

as Exhibit C to the Memorandum of the United States of America in Opposition to the

Defendant's Motion to Withdraw His Guilty Plea.)

III.  Discussion

Defendant has not shown a fair and just reason supporting withdrawal of his guilty plea.

a.  The lengthy delay between the Defendant's Plea

   and filing the Motion undermines the Motion

Defendant did not file his Motion until more than six months had passed since

his guilty plea.  Defendant attributes the delay to the fact that he was unrepresented during that

period.  However, not only was Defendant represented by Messrs. Buckley and Cohen during

that period, see J supra, he is also a sophisticated businessman capable of requesting court-appointed counsel.

  b. <u>Defendant's Assertions of Innocence are Baseless</u>

   Defendant's assertions of innocence are contradicted by the trial evidence and Defendant's admissions during the guilty plea proceeding.

  c. The Government Would be Prejudiced if
    <u>Defendant were Permitted to Withdraw his Plea</u>

   If the case were retried, witnesses would need to travel significant distances and be prepared for trial, an undertaking that would be difficult to reassemble, with less fresh recall by witnesses.

  d. <u>Defendant's Claims of Ineffective Assistance of Counsel are Meritless</u>

   Defendant lacks any credibility.  He defrauded his victim of $10 million, he repeatedly lied about his background, he destroyed evidence and tampered with witnesses.  His claims of ineffective assistance have been roundly refuted by his lawyers, whom I find credible. From my own observation of defense counsel, they were effective in representing Defendant.

  Defendant has also moved for return of all fees from his lawyers, based on their alleged ineffective assistance of counsel.  Given this Court's conclusion herein that counsel rendered effective legal assistance to Defendant throughout the representation, the Court denies Defendant's motion for return of attorneys' fees.

  The Court denies Defendant's motion without an evidentiary hearing.  No hearing is warranted, because Defendant has failed to raise "significant questions regarding the voluntariness or general validity of the plea." *U.S. v. Gonzalez*, 970 F.2d 1095, 110 (2d Cir.

1992).[1]

      SO ORDERED.


DATED:  New York, NY
             January 31, 2016


                     /s/
                       KIMBA M. WOOD
               United States District Judge

---

[1]Although Defendant has asked the Court to exercise ancillary jurisdiction and direct that all funds paid to counsel be returned to the Defendant, no formal motion has been made, and the Court will not consider the matter absent a formal motion.